******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DATTCO, INC. *v.* COMMISSIONER
OF TRANSPORTATION
COLLINS BUS SERVICE, INC. *v.* COMMISSIONER
OF TRANSPORTATION
NASON PARTNERS, LLC *v.* COMMISSIONER
OF TRANSPORTATION
THE NEW BRITAIN TRANSPORTATION
COMPANY *v.* COMMISSIONER
OF TRANSPORTATION
(SC 19558)

Palmer, Zarella, Eveleigh, McDonald, Robinson and Vertefeuille, Js.

*Argued October 20—officially released December 27, 2016*

*Jeffrey J. Mirman*, with whom was *David A. DeBassio*, for the appellants (plaintiffs).

*Eileen Meskill*, assistant attorney general, with whom were *Charles H. Walsh*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Alan N. Ponanski*, assistant attorney general, for the appellee (defendant).

*Opinion*

ZARELLA, J. General Statutes § 13b-36 (a) permits the defendant, the Commissioner of Transportation (commissioner), to take by eminent domain "any land, buildings, equipment or facilities" if the commissioner finds that their taking is "necessary for the operation or improvement of transportation services." In this appeal, we must determine whether the commissioner's power to take "facilities" includes the power to take a government issued certificate permitting a bus company the right to operate over a given route. We conclude that it does not.

I

The parties do not dispute the facts relevant to this appeal. The plaintiffs are four bus companies operating buses over routes in and around the cities of Hartford and New Britain.[1] Each plaintiff holds a certificate of public convenience and necessity, granting it authority to operate a bus service over a specified route. The certificates were issued under predecessor statutes to what is now General Statutes § 13b-80. Section 13b-80 provides that "[n]o person, association, limited liability company or corporation shall operate a motor bus without having obtained a certificate . . . specifying the route and certifying that public convenience and necessity require the operation of a motor bus or motor buses over such route."

The certificates in question were each issued before October 1, 1979. Most were issued by the predecessor agency to the Division of Public Utility Control (DPUC), with one of them issued by the Greater Hartford Transit District. Before October 1, 1979, the DPUC's predecessor and transit districts held exclusive authority to regulate private bus service and to issue certificates of public convenience and necessity to private bus companies. See, e.g., General Statutes (Rev. to 1975) §§ 16-309 and 16-312a; see also General Statutes (Rev. to 1975) § 7-273d. Effective October 1, 1979, however, the legislature transferred the authority to regulate bus companies to the Department of Transportation; see Public Acts 1979, No. 79-610, § 9 (P.A. 79-610); and the legislature amended P.A. 79-610 in 1980 to make clear that any certificates issued before the transfer of authority would "remain valid unless suspended or revoked . . . ." Public Acts 1980, No. 80-25, § 2, codified at General Statutes (Rev. to 1981) § 13b-80. The transit districts have retained their power to regulate bus service within their respective jurisdictions. See General Statutes § 7-273d. Although some of the certificates have been amended since they were issued, neither the commissioner nor the Greater Hartford Transit District has moved to suspend or revoke them.

Recently, however, the state constructed a new designated busway between New Britain and Hartford.

According to the plaintiffs, the new busway incorporates some of the routes over which the plaintiffs currently operate, and the state sought to hire new companies to operate buses over these routes. The plaintiffs claim that their certificates give them exclusive rights to operate over the routes at issue, precluding the commissioner from authorizing other operators to use them unless the commissioner properly suspends or revokes their certificates for cause.

In a separate action that is not the subject of this appeal, the plaintiffs sought to enjoin the commissioner from allowing other companies to operate motor buses over their designated routes. The trial court in that case issued a preliminary injunction precluding the commissioner from transferring the routes at issue to new operators pending the outcome of the litigation.

While that case was pending, however, the commissioner condemned the certificates pursuant to the state's power of eminent domain, prompting the plaintiffs to file the actions that are the subject of this appeal. The plaintiffs each claim that the commissioner lacks the statutory authority to condemn their certificates. They seek permanent injunctive and other relief preventing the commissioner from carrying out the condemnations.

The trial court consolidated all of the actions, and the parties filed motions for summary judgment. The plaintiffs argued that the commissioner lacked the authority to take the certificates as a matter of law, whereas the commissioner claimed that the General Statutes clearly vested him with such power. The disagreement between the parties centered on the term "facilities," as used in § 13b-36 (a), which vests the commissioner with the power of eminent domain. That statute authorizes the commissioner to take "land, buildings, equipment or facilities" if he deems their taking necessary. General Statutes § 13b-36 (a). The commissioner argued that the word facilities has a broad meaning and includes anything that promotes the ease of any action. According to the commissioner, the certificates are "facilities" inasmuch as they enable the plaintiffs to carry out their businesses. The plaintiffs disagreed, however, claiming that the term "facilities," as used in the statute, refers only to tangible assets, not intangible rights like the certificates at issue, which represent a government bestowed operating right.

The trial court denied the plaintiffs' motion for summary judgment but granted the commissioner's motion for summary judgment. The trial court agreed with the commissioner's interpretation and concluded that § 13b-36 (a) gave the commissioner authority to condemn the certificates. The trial court then rendered judgment in favor of the commissioner in each of the consolidated cases. This appeal followed.

Because the decision to grant a motion for summary judgment is a question of law, our review of the trial court's decision is plenary. See, e.g., *Rocco* v. *Garrison*, 268 Conn. 541, 548–49, 848 A.2d 352 (2004).

II

The commissioner may condemn the certificates at issue only if the legislature has delegated that authority to him by legislative act. The plaintiffs each hold a property right in their own certificates that cannot be taken by the state without due process of law. See *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 423, 449 A.2d 1036 (1982). The parties agree that the plaintiffs can be deprived of their rights in their certificates only if the certificates are suspended or revoked for cause pursuant to § 13b-80, or condemned under the state's eminent domain power. See id.; see also General Statutes § 13b-80. The commissioner has not attempted to suspend or revoke the certificates, so he may terminate the plaintiffs' rights only through condemnation. The power to condemn resides with the legislature, but the commissioner may exercise this power if the legislature has delegated it to him. E.g., *Northeastern Gas Transmission Co.* v. *Collins*, 138 Conn. 582, 586–87, 87 A.2d 139 (1952). When the legislature delegates eminent domain power, we will enforce the grant of power consistent with the purposes of the legislation, but we interpret the scope of the power granted strictly, and in favor of the property owner and against the condemner. *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 601, 790 A.2d 1178 (2002). Moreover, when the legislature delegates eminent domain power, "the extent of the power is limited by the express terms or clear implications of the statute authorizing its exercise." *Northeastern Gas Transmission Co.* v. *Collins*, supra, 592. There is no question that the state holds the power to condemn the certificates—the question before us is whether the legislature has delegated that power to the commissioner.

The commissioner claims that this delegation is found in General Statutes § 13b-36 (a). As in the trial court, the parties disagree in this appeal whether the term "facilities," as used in that statute, refers only to tangible assets or whether it also allows the commissioner to take intangible operating rights. We conclude that § 13b-36 (a) does not permit the commissioner to take intangible operating rights like those reflected in the certificates in question.

A

We look first to the text of the statute at issue to determine whether its terms provide the commissioner the power he claims. See General Statutes § 1-2z. Section 13b-36 (a) confers eminent domain powers on the commissioner and describes the types of property that

he may take using this power. That statute provides: "The commissioner may purchase or take and, in the name of the state, may acquire title in fee simple to, or any lesser estate, interest or right in, *any land*, *buildings*, *equipment or facilities* which the commissioner finds necessary for the operation or improvement of transportation services. The determination by the commissioner that such purchase or taking is necessary shall be conclusive. Such taking shall be in the manner prescribed in subsection (b) of section 13a-73 for the taking of land for state highways." (Emphasis added.) General Statutes § 13b-36 (a).

The legislature did not define the term "facilities" in this statute, so we interpret the term according to its common meaning; General Statutes § 1-1 (a); and we look to the dictionary to glean that meaning. See, e.g., *Potvin* v. *Lincoln Service & Equipment Co.*, 298 Conn. 620, 633, 6 A.3d 60 (2010). Webster's Third New International Dictionary sets forth five distinct meanings for the word "facility," two of which are relevant to the statute at issue: (1) "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or to facilitate some particular end"; and (2) "something that promotes the ease of any action, operation, transaction, or course of conduct . . . ." Webster's Third New International Dictionary (2002) p. 812. Although the first definition suggests a tangible item based on the examples provided in the definition, the commissioner seizes on the second, broader interpretation. He argues that it is broad enough to include *anything* tangible or intangible attendant to the plaintiffs' businesses.

We disagree that the commissioner's preferred definition of "facilities" is broad enough to encompass the certificates at issue because they do not merely "promote the ease" of the plaintiffs' business but, in fact, authorize it in the first place. To be sure, this broader definition may, standing alone, refer to intangible rights that promote the ease of a given action—like contract rights—and courts have concluded as much. See, e.g., *Hartford Electric Light Co.* v. *Federal Power Commission*, 131 F.2d 953, 961 (2d Cir. 1942) (concluding that power company's "facilities" included company's contracts and accounts), cert. denied, 319 U.S. 741, 63 S. Ct. 1028, 87 L. Ed. 1698 (1943). But the operating rights reflected in the certificates are of a different character than something that promotes the ease of an action. They are not used by the plaintiffs to ease their provision of service or to better their service to passengers; the certificates provide the important, fundamental authority to conduct the service in the first place. We are not aware of any case that has examined the meaning of the term "facilities" and interpreted that term as encompassing a government issued operating right. In fact, in the only other case brought to our attention

that has considered a similar question, the court concluded that the term "facility" does *not* refer to a company's operating rights.[2] *Lynnwood Utility Co.* v. *Franklin*, Tennessee Court of Appeals, Docket No. 89-360-II (April 6, 1990) (determining, in condemnation case, that "[a] [c]ertificate of [c]onvenience and [n]ecessity is not a facility").

We therefore conclude that interpreting "facilities" to refer not just to what makes an action easier, but also to the very authority that authorizes the action altogether, would unduly stretch the meaning of that term too far. This is especially true considering that we must construe a delegation of eminent domain power strictly and against the power of the condemner. *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 601. Adopting the commissioner's broad interpretation would contradict that principle.

B

Even if we were to assume, however, that the term "facilities," standing alone, could arguably refer to operating rights, the context in which that term is used in the provision at issue and other related provisions convinces us that the legislature did not intend for the term "facilities," as used in § 13b-36 (a), to encompass the certificates at issue.

In addition to considering the dictionary definition of the term "facilities," we must consider its meaning also in the context that it is used in the provision at issue and in related provisions. See General Statutes § 1-2z. The text of the provision at issue, § 13b-36 (a), strongly suggests that the term "facilities" refers to tangible assets, not intangible operating rights.

Section 13b-36 (a) groups the term "facilities" with three other nouns describing what the commissioner may condemn, namely, "land, buildings, equipment," and each refers to tangible objects. Typically, when a statute sets forth a list or group of related terms, we usually construe them together. See, e.g., *Staples* v. *Palten*, 214 Conn. 195, 199–200, 571 A.2d 97 (1990). This principle—referred to as " 'noscitur a sociis' "—acknowledges that "the meaning of a particular word or phrase in a statute is ascertained by reference to those words or phrases with which it is associated." Id., 199. As a result, broader terms, when used together with more narrow terms, may have a more restricted meaning than if they stand alone. See id. ("noscitur a sociis . . . acknowledges that general and specific words are associated with and take color from each other, *restricting general words to a sense . . . less general*" [emphasis added; internal quotation marks omitted]).

The legislature's grouping of the term "facilities" with other nouns that all denote tangible objects favors a conclusion that the term "facilities" also refers to tangi-

ble objects other than land, buildings, and equipment that might be used in a transportation system. Moreover, interpreting "facilities" to mean only tangible items does not render it superfluous or redundant with respect to the terms "land," "buildings," or "equipment," as the commissioner suggests. The term "facilities" embraces numerous tangible items—other than land, buildings, or equipment—including bridges; General Statutes § 13b-56; docks; General Statutes § 13b-56; see also *Coeur D'Alene & St. Joe Transportation Co.* v. *Ferrell*, 22 Idaho 752, 758, 128 P. 565 (1912); side railroad tracks that are part of a rail system; *Tucker* v. *St. Louis-San Francisco Railway Co.*, 298 Mo. 51, 58, 250 S.W. 390 (1923); dams and reservoirs; *Wright* v. *Sabine River Authority*, 308 So. 2d 402, 406, 410 (La. App. 1975); and even horses. *Bernardine* v. *New York*, 294 N.Y. 361, 365, 62 N.E.2d 604 (1945). On the other hand, interpreting "facilities" to broadly refer to *anything* that supports a given action, as the commissioner argues and the dissent agrees, would render superfluous the terms "land," "buildings," and "equipment" in § 13b-36 (a) because those items would already be encompassed within the broad meaning of "facilities" urged by the commissioner. See, e.g., *Lopa* v. *Brinker International, Inc.*, 296 Conn. 426, 433, 994 A.2d 1265 (2010) ("[b]ecause [e]very word and phrase [of a statute] is presumed to have meaning . . . [a statute] must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant" [internal quotation marks omitted]).

In addition, other provisions in title 13b of the General Statutes, which governs the powers of the commissioner, similarly indicate that the legislature intended for facilities to refer to tangible assets. See, e.g., *In re Williams D.*, 284 Conn. 305, 313, 933 A.2d 1147 (2007) ("[i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction" [internal quotation marks omitted]). The term "facilities" is often paired with other tangible objects throughout title 13b, as in § 13b-36 (a). See, e.g., General Statutes § 13b-34 (a) (referencing "equipment or facilities"); General Statutes § 13b-34 (h) (referencing "transportation equipment and facilities"); General Statutes § 13b-56 (referring to "facilities and structures" and "structures and facilities"). Most significantly, in many instances, the legislature has used the term "facilities" in a manner that would be coherent only if "facilities" meant a tangible asset. For example, General Statutes § 13b-4d (b) allows the commissioner to declare a state of emergency "[w]hen a privately-owned railroad system, its facility or equipment is damaged as a result of a natural disaster . . . ." General Statutes § 13b-32 sets forth the general transportation policy of the state favoring "[t]he development and maintenance of a modern, efficient and adequate system of motor

and rail facilities . . . ." General Statutes § 13b-38 allows the commissioner to make loans to transit districts "to help the transit district to plan, research, construct, reconstruct, subsidize, operate or maintain transit systems, including property, equipment and facilities . . . ." General Statutes § 13b-101 (3) (B) exempts from regulation certain livery services to and from "a location or facility which is not open for business on a daily basis throughout the year . . . ." General Statutes § 13b-283 (e) empowers the commissioner to order any utility company to "readjust, relocate or remove its facility . . . ." In each of these instances, the use of the word "facility" evokes a tangible asset used in transportation systems, and it would be absurd to apply these statutes to include an intangible operating right. It would, after all, be nonsensical for the statutes to call for the construction or relocation of an operating right or to refer to a certificate being open for business. When, as in the present case, a word is used multiple times in a statutory scheme, we presume that the legislature intended each use of the word to have a common meaning. See, e.g., *In re Jusstice W.*, 308 Conn. 652, 664–65, 65 A.3d 487 (2012).[3]

Consequently, even if the definition of "facilities," standing alone, could encompass the certificates at issue, construing that term in context calls for a more restricted meaning. Therefore, reading the term "facilities" in context, as it is used in § 13b-36 (a) and other provisions in title 13b of the General Statutes, convinces us that the legislature did not intend for the term to refer to intangible operating rights reflected in the certificates at issue.[4]

Indeed, a related statutory scheme demonstrates that, when the legislature intended for a delegation of takings power to allow for the acquisition of a bus company's operating rights, the legislature granted that power explicitly. Like the commissioner, transit districts have power to regulate and provide bus service. Like the commissioner, transit districts also have been granted certain eminent domain powers. Specifically, General Statutes § 7-273e (a) empowers a transit district to use eminent domain to "acquire all or a portion of the property and *franchises* of any company or companies operating a transit service in the district . . . ." (Emphasis added.) Unlike the term "facilities," the meaning of the term "franchise" expressly includes a government conferred operating right. See Webster's Third New International Dictionary, supra, p. 902 (defining "franchise" as "a right or privilege conferred by grant from a sovereign or a government and vested in an individual or a group" and, more specifically, as "a right to do business conferred by a government"). No similarly clear language authorizing the taking of a company's operating rights appears in the statutes governing the commissioner's eminent domain powers, further indicating that the legislature did not intend for his

takings power to extend to the certificates at issue. See, e.g., *State* v. *B.B.*, 300 Conn. 748, 759, 17 A.3d 30 (2011) ("[when] a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" [internal quotation marks omitted]).

C

The commissioner argues, however, that, even if the power to condemn the certificates is not explicit in the statute, it is implicit in his express power to take any land, buildings, equipment or facilities of a bus company, and in his incidental powers to improve transportation systems in this state. See General Statutes § 13b-23.[5] According to the commissioner, if he can take all of the bus company's tangible assets, then, it follows, he also may condemn their operating rights. We disagree.

A delegation of eminent domain power must be clearly given and strictly construed; see, e.g., *Northeastern Gas Transmission Co.* v. *Collins*, supra, 138 Conn. 592. A clear delegation is not expressly granted or clearly implied either in the specific grant of eminent domain power in § 13b-36 (a) or in the commissioner's incidental powers in § 13b-23. Even though we conclude that the commissioner does not have authority to condemn the certificates, his inability to condemn the certificates at issue does not render meaningless his takings power as applied to bus companies. He retains the power to suspend or revoke certificates for cause; see General Statutes § 13b-80; and his takings power supplement his power to suspend or revoke the certificates. If the commissioner should need to revoke a bus company's certificate for poor performance and choose to have the state or another company operate over certain bus routes, § 13b-36 (a) also permits him to take the bus company's tangible assets for use in continuing to provide bus service, albeit with a different operator. Moreover, it is not absurd to conclude that the legislature gave the commissioner the power to take tangible items needed for a transportation system but not a bus company's operating rights given that, at the time the legislature enacted § 13b-36 (a), the commissioner did not have the power to regulate bus companies or their certificates. When the legislature enacted § 13b-36 (a) in 1969; see Public Acts 1969, No. 768, § 30; the power to issue certificates of public convenience and necessity to bus operators was then held by the DPUC's predecessor agency, the Public Utilities Commission. See General Statutes (Supp. 1969) § 16-309; General Statutes (Rev. to 1966) § 16-312a. Although the legislature allowed the commissioner to be heard at hearings concerning these certificates, it did not grant the commissioner power to issue, suspend, or revoke them. See General Statutes (Supp. 1969) § 13b-37. Moreover, when the legislature enacted § 13b-36 (a), the commissioner

also had no power to regulate bus service, such as by setting fares, routes or schedules. That power was held instead by the Public Utilities Commission and the transit districts. See General Statutes (Rev. to 1966) § 7-273d; General Statutes (Supp. 1969) § 16-309; General Statutes (Rev. to 1966) § 16-312a. Given that the commissioner had no power to regulate either the certificates or the services provided by bus companies when § 13b-36 (a) was enacted, it would not be absurd for the legislature to allow the commissioner to take tangible items necessary to improve transportation systems but not to condemn rights that he was not otherwise expressly permitted to grant or regulate. When the power to issue certificates and regulate bus service was transferred to the commissioner in 1979; see P.A. 79-610, § 9; the legislature updated many of the statutes pertaining to the regulation of bus service to reflect the commissioner's new role but, significantly, did not amend § 13b-36 (a). Although transit districts have been expressly given the power to take operating rights; see General Statutes § 7-273e; no such specific authority has been given to the commissioner after the legislature granted him oversight over bus service. The legislature may ultimately deem it good policy for the commissioner to have the power to condemn certificates, but we conclude that the legislature has not yet granted that power to the commissioner.[6]

We therefore conclude that the trial court improperly granted the commissioner's motion for summary judgment and that it improperly denied the plaintiffs' motion. This conclusion requires us to consider the appropriate remedy. In their complaint, the plaintiffs sought an injunction from the trial court preventing the commissioner from (1) condemning the certificates, and (2) operating any buses over the plaintiffs' designated routes. In their arguments to this court, the plaintiffs have argued that such relief is proper and necessary to protect their rights in their certificates. Nevertheless, the issue of whether an injunction is necessary in addition to a judgment, and the precise parameters of any injunction, have not been considered by the trial court. In addition, the plaintiffs' request for an injunction barring the commissioner from operating any buses over any of their designated routes may impact the separate, pending litigation concerning the extent of the plaintiffs' operating rights under their certificates, including whether the plaintiffs' rights over those routes are exclusive. That dispute is not before us in the present appeal. Accordingly, we conclude that a decision of whether any injunctive relief is necessary, and the parameters of any injunctive relief, if granted, is a decision that must be made in the first instance by the trial court on remand.

The judgments are reversed and the cases are remanded with direction to deny the commissioner's motion for summary judgment, to grant the plaintiffs'

motion for summary judgment on the condemnation issue and to render judgment for the plaintiffs on that issue, and to remand the case for further proceedings to determine whether any injunctive relief is necessary and the parameters of any such relief, if granted.

In this opinion PALMER, EVELEIGH and VERTE-FEUILLE, Js., concurred.

[1] The plaintiffs are Dattco, Inc., Collins Bus Service, Inc., Nason Partners, LLC, and The New Britain Transportation Company. Each brought a separate action against the commissioner to enjoin him from taking their respective certificates, and those actions were consolidated.

[2] One court has interpreted the term "facilities" to include a company's operating rights, but the court reached that conclusion because a contrary construction in that case would have rendered the statute at issue unconstitutional. See *Mississippi Power & Light Co.* v. *Clarksdale*, 288 So. 2d 9, 12 (Miss. 1973) (concluding that statute "[could not] be constitutionally applied in [the] case unless the word 'facilities' [was] construed as including [a power company's] operating rights"). There was no claim in that case that the ordinary meaning of the term "facilities" extended to operating rights. See id., 11.

[3] Certain provisions in title 13b of the General Statutes refer to one form of an intangible facility—a credit facility. See, e.g., General Statutes § 13b-79r (d) (4). But when the provisions of title 13b refer to a credit facility, they do so by pairing the words "credit" and "facility" rather than using "facility" alone. See, e.g., General Statutes § 13b-79r (d) (4). This indicates that, when the legislature intended to refer to an intangible facility, it did so expressly.

[4] The dissent would apply a much broader meaning of the term "facilities," relying in significant part on a decision from the Missouri Supreme Court; see *Mashak* v. *Poelker*, 367 S.W.2d 625 (Mo. 1963); giving a broader meaning to the term "facilities." Significantly, however, that case has little bearing on our decision because it did not involve a delegation of the takings power, and adopting a broad interpretation of the meaning of "facilities" in the face of a more limited interpretation would violate the well established principle that we must strictly construe any delegation of the takings power. *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 601.

[5] The commissioner did not cite § 13b-23 as authority for the condemnation in his notices of condemnation issued to the plaintiffs. We will nevertheless briefly address the commissioner's arguments based on this statute because the plaintiffs have not objected to the commissioner's arguments concerning this provision, and, in any event, those arguments are unavailing.

[6] The commissioner has also claimed that § 13b-34 (c) also empowers him to condemn the certificates, but we disagree. That provision does not clearly confer eminent domain power but, instead, appears to empower the commissioner to purchase or dispose of property. Notably, that provision does not expressly refer to the commissioner's power to "take" property, as in § 13b-36 (a); nor does it prescribe the procedures for instituting a taking, as § 13b-36 (a) does. If § 13b-34 (c) authorizes a taking, as the commissioner claims, we would expect to see procedures for exercising that power, as such procedures would be required to afford a property owner due process of law.